**David Lee ROBINSON, Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

No. 2004–SC–000050–MR.

Supreme Court of Kentucky.

Sept. 22, 2005.

As Modified on Denial of Rehearing Jan. 19, 2006.

Thomas M. Ransdell, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, Gregory C. Fuchs, Assistant Attorney General, Office of Criminal Appeals, Attorney General's Office, Frankfort, Counsel for Appellee.

SCOTT, Justice.

The Appellant, David Lee Robinson, was convicted by the Grayson Circuit Court of Manufacturing Methamphetamine, First–Degree Trafficking in a Controlled Substance (Methamphetamine), Possession of Marijuana, and Possession of Drug Paraphernalia. He was sentenced to 20 years for manufacturing and ten 10 years for trafficking, 12 months and a $500 fine for possession of marijuana and 12 months and a $500 fine for possession of drug paraphernalia. The court ordered the felony sentences be run consecutively for a total of thirty (30) years and the misdemeanor sentences were to run concurrent therewith. For the reasons set forth herein, we affirm the Appellant's convictions on all counts, but reverse and remand for a new sentencing phase.

## FACTS

On August 7, 2001, Benjamin Campbell went to the home of James Clemons, a close friend of his father, for the purpose of sharing the news of his August 6, 2001, marriage to Samantha (Higdon) Campbell. Benjamin, however, was surprised by the less than friendly reception he received upon his arrival at the Clemons house; in fact, Clemons ran Benjamin off his property.

Benjamin appeared upset upon his return to his new bride. Samantha then decided to pay a visit to James Clemons to see just why her husband had been treated so poorly.

When Samantha reached the Clemons house, there was a man on the front porch calling someone on his cellular telephone. When she asked to speak to Clemons, she was told Clemons was not there; Samantha, though, knew Clemons was there. After the man on the front porch left, she walked to the back of the house whereupon she detected the smell of ether. She then looked through the window of the back door where she saw "the liquid fire (drain cleaner) and coke bottles and hoses and the white powdery substance and stuff like that." She knew what the stuff was because her husband was on drugs and she, too, had taken methamphetamine. There were four persons in the house; she

recognized Clemons as one of them, but did not recognize, at that time, any of the others. She also saw one of the individuals smoking the powdery substance in a light bulb, a common method of methamphetamine use. She went back to the front of the house because she felt "there was trouble there."

When she returned to the front of the house, Clemons came out to speak to her. According to Samantha, "He was cussing and I asked him about Ben, and he said Ben was trouble....I just know that he said he didn't want him there." Clemons told her to leave and, again, began cursing. Ultimately, he shoved her off the porch, referring to her as a "whore" and "bitch."

The next morning, the newlywed Campbells went to the Leitchfield Police Department to report the incident. The report was given to the Deputy Dennis Poteet of the Grayson County Sheriff's Office as it was determined to have occurred outside the city limits.

Samantha then related to the Deputy the events of the previous day. She told him she smelled ether and that there was still smoke in the room from the individuals having smoked the "crank." She reported she recognized Clemons and that there were three other males she did not recognize. The Appellant, David Robinson was one of the males Samantha later identified as being present that day; though she did not know his identity at that time.

Soon thereafter, Deputy Poteet obtained a search warrant for the Clemons residence. At the time of the execution of the search warrant, Clemons was not at home, but the Appellant was present in the residence. In what was believed to be the Appellant's bedroom, the search uncovered two small packets of what was later determined to be methamphetamine, a partial marijuana cigarette and other drug paraphernalia, including a light bulb.

In the kitchen of the residence was a bottle with capsules of MSM, plastic baggies, coffee filters, salt, and an additional packet of white substance. Additional paraphernalia in the form of scissors and a pair of hemostats was found in the living room.

In the back of a pickup truck, parked behind a garage near the house, police found a glass jar with a coffee filter on the top of it, a 20 oz. Sprite bottle with a hole in the cap that had allegedly been modified for use as an "HCI generator" (an item of equipment used in the final step in the manufacture of "usable" methamphetamine), a substance which was alleged to have a strong ether smell (this item was never tested), a turkey baster and some coffee filters.

Thereafter, the Appellant and Clemons were both indicted by the Grayson County grand jury. Robinson was charged with the offenses of First–Degree Trafficking in a Controlled Substance (methamphetamine) and Manufacturing Methamphetamine. A superseding indictment was issued adding a firearm enhancement to the trafficking and manufacturing charges and adding a charge of possession of marijuana enhanced by possession of a firearm, possession of drug paraphernalia enhanced by possession of a firearm, and possession of a radio (police scanner) [1].

The trial was conducted by the Grayson Circuit Court though it was held in Meade County with a Meade County jury. This was a result of the inability of the Grayson Circuit Court to seat a jury from Grayson County at a previous trial date.

At trial, Samantha Campbell testified as to her account of the events of August 7,

1. The Possession of a Radio (Police Scanner) charge was disposed of prior to trial.

2001. Deputy Poteet testified concerning the search of the residence conducted the morning after Samantha's visit. He testified that there was no methamphetamine lab in operation when he arrived there; he further testified that he was a close neighbor to Clemons and that he noticed Clemons frequently had many short-term visitors to his house.

Jennifer Winnegar, a chemist with the Kentucky State Police Central Lab in Frankfort testified concerning the testing she performed on the items that were submitted to her and upon the operation of clandestine methamphetamine labs. Winnegar testified that there were several different methods of manufacturing methamphetamine **but that the items found during the search of the Clemons house were consistent with the type of items necessary using the "Nazi Method" or the "Anhydrous Ammonia Reduction Method."** [2] She testified regarding the process necessary to manufacture methamphetamine from beginning to end or until "usable" methamphetamine results. She testified that several, though not all, of the items seized during the search either were methamphetamine or contained methamphetamine residue. She further testified that there was 4.535 grams of measurable methamphetamine found during the search.

She further explained to the jury that there is a difference between "methamphetamine a controlled substance" and "usable methamphetamine." She explained that "usable methamphetamine" was the form of the product that would be sold to the ultimate user on the street, but that "methamphetamine a controlled substance" resulted prior to the final purification step (use of HCI generator). Nonetheless, she testified that methamphetamine was a Schedule II controlled substance regardless of its grade of purity or whether it was the "usable" form of the product.[3] She testified that the HCI generator was required to convert the "methamphetamine a controlled substance" into a "usable" product.

Winnegar stated that to produce methamphetamine a controlled substance, one would need only lithium (camera batteries), anhydrous ammonia, and pseudoephedrine or ephedrine as chemical components and **the only equipment necessary for the "methamphetamine a controlled substance" was "any glass jar that would contain the chemicals."** Neither the Appellant, nor Clemons objected to this testimony; nor did they rebut it.

At the close of the Commonwealth's case, both the Appellant, and Clemons, moved for a directed verdict. Both argued that the Commonwealth had not met its burden of proof with respect to both the trafficking charge and the manufacturing charge. They further moved for directed verdict on the firearms enhancement. After extensive arguments by the Appellant and Clemons and deliberation by the trial judge, the motions for directed verdict were denied. At the close of all the evidence, the Appellant renewed his motion for directed verdict, which was also denied.

Following submission to the jury, the Appellant was convicted of manufacturing methamphetamine, trafficking in methamphetamine, possession of marijuana, and possession of drug paraphernalia. The jury acquitted the Appellant of the firearms enhancements on all counts.

The Appellant appeals from these convictions.

---

**2.** This method is also referred to by various other names.

**3.** *See* KRS 218A.010(4), (5)(a), (11).

## DENIAL OF DIRECTED VERDICT ON MANUFACTURING METHAMPHETAMINE AND FIRST–DEGREE TRAFFICKING IN A CONTROLLED SUBSTANCE (METHAMPHETAMINE)

The Appellant claims the trial court committed reversible error by denying his motion for directed verdict on both the Manufacturing Methamphetamine count and the First–Degree Trafficking in a Controlled Substance (Methamphetamine) count. Specifically, they argue the Commonwealth failed to meet its burden of proof on both counts.

■ A trial court, on a motion for directed verdict, must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given such testimony. *Commonwealth v. Benham*, 816 S.W.2d 186 (Ky.1991).

■ The standard on appellate review of a ruling on a motion for directed verdict, as set out in *Benham*[4] and *Commonwealth v. Sawhill*[5], is if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a verdict of acquittal.

### Manufacturing Methamphetamine

First, with respect to the Manufacturing Methamphetamine charge, KRS 218A.1432 (in effect at that time) enumerated two avenues of proving the crime.

218A.1432(1)(a) provided "a person is guilty....when he knowingly and unlawfully manufactures methamphetamine;". Section (1)(b) provided "a person is guilty....when he knowingly and unlawfully possesses the chemicals or equipment for the manufacture of methamphetamine with the intent to manufacture methamphetamine."

■ According to the evidence, numerous items commonly associated with the manufacture of methamphetamine were found in the Clemons house, where the Appellant was a resident; certain items, though not all, contained evidence of methamphetamine residue which, according to testimony, was a common occurrence in the manufacture of methamphetamine. Additionally, a quantity of methamphetamine was found in the Appellant's bedroom and in other parts of the house. The trial court correctly determined, based upon the evidence, that the Commonwealth had met their burden of proof as to KRS 218A.1432(1)(a).

■ Moving on to KRS 218A.1432(1)(b), the Commonwealth, through its uncontraverted expert witness, Jennifer Winnegar, presented evidence that the chemicals necessary to manufacture methamphetamine a controlled substance were Lithium (or various other metals), anhydrous ammonia, and pseudoephedrine or ephedrine. She further testified that the only equipment necessary for the commission of the crime was a glass jar, like the glass pickle jar found at the Clemons house, in which to contain the necessary chemicals. Again, neither the Appellant nor his co-defendant Clemons presented any evidence to the contrary.

4. *Id.* at 187.

5. 660 S.W.2d 3 (Ky.1983).

In a close reading of KRS 218A.1432 and 218A.1431, there is no requirement that the methamphetamine be in a "usable" form in order to establish a crime. In fact, 218A.1431, defines "Methamphetamine" as any substance that contains any quantity of methamphetamine, including its salts, isomers, and salts of isomers. Considering the evidence and testimony on this issue, the trial court, again, correctly determined that the Commonwealth had met its burden of proof as to KRS 218A.1432(1)(b).

### Trafficking in a Controlled Substance (Methamphetamine)

With respect to the denial of the directed verdict on the trafficking count, KRS 218A.1412 says a person is guilty of First–Degree Trafficking in a Controlled Substance ". . . .when he knowingly and unlawfully traffics in. . . .methamphetamine, including its salts, isomers, and salts of isomers;" KRS 218A.1431(3) further defines "Traffic" specifically related to methamphetamine, as ". . . .to distribute, dispense, sell, transfer, or possess with intent to distribute, dispense or sell methamphetamine."

The Commonwealth presented evidence of the several small packages of finished methamphetamine product, empty baggies which could be used for packaging future product and what is known as a "cutting agent." There was also evidence of a substantial amount of cash ($580.00) found in the residence at the time of the search. Deputy Poteet testified that, as a neighbor of Clemons, he noticed that the Clemons residence received many short-term visitors. As an officer, Deputy Poteet testified that this type of activity was associated with drug trafficking. Considering the testimony and the evidence on this issue, the trial court correctly determined that the Commonwealth had met its burden of proof as to KRS 218A.1412 and 218A.1431(3).

Considering the evidence as a whole, as available to this trial court, we do not find it unreasonable for a jury to find guilt. The trial court did not err.

### DENIAL OF UNANIMOUS VERDICT BY MANUFACTURING INSTRUCTION CONTAINING TWO THEORIES OF GUILT

The Appellant claims he was denied his right to a unanimous verdict when two theories of manufacturing methamphetamine were combined into one jury instruction. Specifically, he claims that the Commonwealth failed to establish the prong of 218A.1432 requiring possession of **"the"** equipment for the manufacture of methamphetamine.

KRS 218A.1432, as in effect at that time, states in pertinent part:

(1) A person is guilty of manufacturing methamphetamine when he knowingly and unlawfully:

(a) Manufactures methamphetamine; or

(b) Possesses the chemicals or equipment for the manufacture of methamphetamine with the intent to manufacture methamphetamine.

This Court, in *Kotila v. Commonwealth,* 114 S.W.3d 226 (Ky.2003), analyzed the language "the chemicals or equipment for the manufacture. . . ." found in KRS 218A.1432 and determined that language to require ALL of the chemicals or equipment necessary to manufacture methamphetamine. We must recognize, however, that **methamphetamine in any form and manufactured by any method is nonetheless methamphetamine and a conviction for manufacturing methamphetamine** can be sustained so long as ALL

the equipment or ALL the chemicals for that particular method used are present.[6]

■ When a jury is presented, in a single instruction, alternate theories of guilt for the same offense, "each juror's verdict [must] be based on a theory of guilt in which the Commonwealth has proven each and every element beyond a reasonable doubt." *Burnett v. Commonwealth*, 31 S.W.3d 878 (Ky.2000).

As we stated previously in our discussion of the denial of the motions for directed verdict, the Commonwealth met its burden of proof on each of the 218A.1432 prongs. We decline to be repetitive. The trial court did not err by instructing the jury as to both prongs, or theories of guilt in this case.

### JURY INSTRUCTION ON FIRST–DEGREE TRAFFICKING IN A CONTROLLED SUBSTANCE (METHAMPHETAMINE)

■ The Appellant claims the trial court erred by instructing the jury as to the charge of First–Degree Trafficking in a controlled substance (Methamphetamine). The Appellant argues that the trial court erred by instructing the jury that they could find he possessed methamphetamine with the intent to "transfer" when, KRS 218A.1431(3) does not include a provision for possession with intent to "transfer."

■ The Appellant tendered a trafficking instruction for the trial court's consideration. However, the instruction he tendered was incorrect in that it included trafficking methods not proven in this case, *i.e.*, possession with intent to distrib-

ute or dispense. *See Burnett & Commonwealth*, 31 S.W.3d 878, 881 (Ky.2000). Furthermore, after the trial court prepared its own instructions, Appellant agreed that the trial court's instructions were correct. One who tenders an incorrect instruction and subsequently agrees that the trial court's own incorrect instruction is correct has failed to preserve the issue for review. *Davis v. Commonwealth*, 967 S.W.2d 574, 580–81 (Ky.1998).

### CONVICTION OF MANUFACTURING METHAMPHETAMINE AND FIRST–DEGREE TRAFFICKING IN A CONTROLLED SUBSTANCE (METHAMPHETAMINE) AS VIOLATION OF DOUBLE JEOPARDY

■ The Appellant alleges that his conviction for both manufacturing and trafficking in methamphetamine violates the principles of double jeopardy. The Appellant did not specifically object to the giving of instructions on both manufacturing and trafficking charges. Appellant's trial counsel merely stated that there would be a double jeopardy problem if Appellant was convicted of both manufacturing and possessing the same methamphetamine. As such, we decline to address the issue beyond the cursory review of the applicable sections of the statute which clearly differentiate between manufacturing and trafficking in methamphetamine.[7] There is no violation of the principles of double jeopardy in the jury's instructions in this case.

### INCORRECT TESTIMONY DURING SENTENCING PHASE

■ The Appellant claims that the Commonwealth presented incorrect, or

---

6. Effective June 20, 2005, the Kentucky General Assembly has amended KRS 218A.1432(1)(b) to require possession of only two (2) or more chemicals or two (2) or more items of equipment for the manufacture of methamphetamine.

7. KRS 218A.1431 does not require a trafficker to be the same person who manufactured the methamphetamine; likewise, KRS 218A.1432 does not require the person who manufactures the methamphetamine to then traffic the drug.

false testimony, during the sentencing phase regarding the application of "good time credits" on the actual amount of time he would be required to serve and that the error, though not preserved for review, constituted palpable error affecting the Appellant's substantial rights and resulted in manifest injustice as provided for in RCr 10.26. *See Schoenbachler v. Commonwealth,* 95 S.W.3d 830, 836 (Ky.2003).

During the Appellant's sentencing phase, the Commonwealth called Eric Franklin, a probation and parole officer, to testify as to parole eligibility for convicted offenders. He testified that under the parole eligibility guidelines, defendants would have to serve 20% of their sentences before being eligible for parole. He also testified that for each year a prisoner serves he/she is are given three months of statutory good time. Franklin's testimony resulted in the jury being misinformed as to when the statutory good time credits would be applied to reduce a sentence. **Franklin told the jury, and the Commonwealth pointed out in its closing argument, incorrectly, that the good time credits would be figured into the defendant's parole eligibility.**

■ Although statutory good time is listed in the sentence calculation on a prisoner's resident record card, the prisoner does not actually receive credit for his good time until he reaches the minimum parole eligibility (or, in this case, service of 20% of his sentence). *See Martin v. Chandler,* 122 S.W.3d 540 (Ky.2003).

■ The use of incorrect, or false, testimony by the prosecution is a violation of due process when the testimony is material. *Napue v. Illinois,* 360 U.S. 264, 269, 272, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). This is true irrespective of the good faith or bad faith of the prosecutor. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215

(1963). When the prosecution knows or should have known that the testimony is false, the test for materiality is whether "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976).

The question remains whether the testimony influenced the jury to render a sentence greater than what it might otherwise have given absent the incorrect testimony. We believe it did and, for sure, can't say it didn't. The Commonwealth relied, almost solely, on Franklin's testimony to persuade the jury to recommend the maximum sentence. The jury was given information to consider that was obviously confusing to the very people who deal with it on a daily basis. There is a reasonable likelihood that the jury was influenced by the incorrect testimony.

### CONCLUSION

As such, we reverse the sentencing order and remand this matter back to the trial court for a new sentencing phase trial and sentencing on all convictions.

All concur.