**Casey KAYS, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee**

**NO. 2014-CA-001924-MR**

Court of Appeals of Kentucky.

OCTOBER 14, 2016; 10:00 A.M.

BRIEFS FOR APPELLANT: Brandon Neil Jewell, Assistant Public Advocate, Frankfort, Kentucky

BRIEF FOR APPELLEE: Andy Beshear, Attorney General of Kentucky, Jeffrey R. Prather, Assistant Attorney General, Frankfort, Kentucky

BEFORE: KRAMER, CHIEF JUDGE; NICKELL AND THOMPSON, JUDGES.

1. Kentucky Revised Statutes (KRS) 510.060(1)(b), a Class D felony.

2. KRS 510.090(1)(b), a Class D felony.

## OPINION

NICKELL, JUDGE:

Casey Kays stands convicted of one count of rape[1] and one count of sodomy,[2] both in the third degree. Conviction followed an October 2014 trial where jurors chose the maximum sentence of five years on each charge, terms to be served consecutively for a total of ten years. The Jefferson Circuit Court sentenced Kays in conformity with the jury's decision.

Charges stemmed from Kays having sex with A.J.,[3] a teenage girl who had been his student and a player on the high school volleyball team he coached. Kays now challenges the final judgment alleging a juror was erroneously struck for cause; text and Facebook messages should have been excluded due to lack of authentication; his ex-wife should have been barred from testifying about confidential marital conversations; and, jurors should have received more sentencing information. Having reviewed the record, the briefs and the law, we affirm.

### FACTS

A.J. was a bright student. Teachers recognized her leadership qualities by voting her "Student of the Month." In 2013, Kays was her civics teacher at The Academy at Shawnee High School in Jefferson County, Kentucky. According to A.J., Kays was one of the cooler teachers. A.J. wanted to play volleyball her sophomore year—a decision her mother supported—and joined the team because Kays was the coach. Kays communicated with the players via a Facebook page named "Shawneevball."

Initially, A.J. and Kays had a "normal" student-teacher relationship. That changed

3. To protect the child's identity, she will be referred to by initials only and her mother will be referred to as "mother."

at the end of A.J.'s freshman year. On the last day of school, A.J.—then fifteen—sent Kays—then thirty-eight—a Facebook message saying she had feelings for him. Kays gave A.J. his phone number. Soon they were texting twenty to fifty times a day and a "serious" relationship blossomed in a few weeks.

The pair talked on the phone hours at a time—often well into the night. They texted and engaged in live video chats on Facetime, all of which included explicit talk of sexual acts and a plan to get together to have sex. A.J. sent Kays nude photos of herself; Kays sent A.J. an image of his penis. On at least one occasion there was talk of Kays buying A.J. a ring. Kays also talked to A.J. about his wife and spoke often of hiding their relationship from his wife, an assistant principal at a local middle school. Kays' pet name for A.J. was "Babygirl." When the relationship with Kays began, A.J. was dating Jacob, a boy she had been seeing off and on for two years; Kays was jealous of Jacob.

Kays testified he may have been in the throes of depression or a midlife crisis when his relationship with A.J. began. Texting with A.J. was "fun and exciting"—something he looked forward to daily. At trial, he acknowledged sending A.J. highly personal messages and admitted doing so was probably wrong and crossed boundaries. He denied they exchanged nude photos or that he ever had sexual contact with her. The most he admitted was kissing A.J. three times while in his car—something he knew was inappropriate. At some point A.J. gave Kays two hickeys, prompting an online thread between the two about Kays buying cosmetics to hide the marks on his neck.

A.J.'s mother—describing herself as "overprotective"—suspected Kays was involved with her daughter after several disturbing signs during the first week of volleyball practice in mid-July 2013. Mother was to drive A.J. to and from daily practice—the gym was only a few blocks from their home. One day, A.J. did not come home on her own and did not answer her phone. Worried, mother messaged the Shawneevball Facebook page—controlled by Kays—expressing concern for her daughter's whereabouts. She received no response from the Facebook page, but within five minutes A.J. called saying Kays had driven her and other players to the Louisville waterfront. Mother thought this "crossed the line" because Kays had not received parental permission for the trip. Kays drove A.J. home a couple of other times even though mother had forbidden him from doing so. After 10:00 p.m. one night, Kays scheduled volleyball practice for early the next morning, saying he knew the girls had nothing better to do; mother thought this odd—how would he know the girls' plans?

Knowing Kays was not to drive her home from practice, and knowing mother was awaiting a phone call to pick her up, A.J. came home another afternoon waving bus passes and saying she had ridden the TARC bus. Mother knew this to be a lie because their home is mere blocks from the school and her daughter would never ride a city bus. Mother suspected A.J. was hiding a relationship with Kays, but had no proof.

Later that afternoon, A.J. was not in her room, the house, or the surrounding block. When mother returned home from running an errand, she asked A.J. where she had been. A.J. said she had been in her room—sleeping—the whole time. When mother told her that was untrue, A.J. said she had walked to the store to buy candy, but mother knew she had no money, and, knew she would not walk to the store alone. At that point, A.J. claimed she had resumed seeing a boy she had not mentioned in

almost a year—the boy had supposedly gotten his driver's license and driven a good distance to visit A.J. for fifteen to twenty minutes. Mother knew this story was false and called her daughter's bluff, bluntly asking if she was having a relationship with Kays.

A.J. initially denied any relationship with Kays, but then broke into tears and admitted she and Kays were romantically involved and had been intimate, but gave no specifics. Mother called police on July 19, 2013.

The next morning, mother demanded specifics. A.J. said she and Kays had unprotected intercourse in his car one time and on another occasion Kays performed oral sex on her, again in his car, just around the corner from her home. Mother called police again on July 20, 2013.

Not knowing whether there was proof of a relationship, but strongly hoping there was, mother logged on to Facebook posing as A.J. and sent Kays a message. He responded, producing a thread of messages between mother as "A.J." and Kays in which he directed "A.J." to delete all messages and "[d]eny everything," suggested alibis "A.J." should give mother, inquired about the status of "A.J.'s" cell phone and punishment, and professed his love and desire for "A.J." During this thread, which was introduced at trial, Kays asked "A.J." whether he should reply to mother's Facebook message of a few days before about A.J. not returning home from volleyball practice. The pair decided a reply to mother was best, so Kays sent a message to mother apologizing for his late response. Mother replied, thanking Kays for providing his phone number and directed him not to drive A.J. anywhere without her permission.

On July 20, 2013, Patrolman Jorge Soto-Perez responded to mother's calls about the sexual assault on A.J. He spoke first with mother who provided general details A.J. had revealed to her. Soto-Perez then spoke privately with A.J. Initially, A.J. was not forthcoming with information, but finally opened up to him—a father himself who told her about sexual predators—saying Kays loved her, was her boyfriend, and had sex with her in his vehicle. At that point, Soto-Perez called the Crimes Against Children Unit (CACU) and Det. Rico Williams took over the case. CACU investigates sexual and physical abuse, and exploitation of children under sixteen years of age.

As part of his investigation, Det. Williams sent a request to Facebook on or about July 22-23, 2013, asking that texts be preserved for ninety days. No extension was submitted and the request expired. Det. Williams saw no reason to follow up with Facebook because he received the desired information from Det. Mike Mulhall, a district investigator with Jefferson County Public Schools (JCPS), and Kays had already provided his e-mail contact list. Det. Williams did not review A.J.'s phone records, nor records from any wireless carrier.

On July 20, 2013, mother took A.J. to the hospital where A.J. told a nurse she had been sexually active with a school coach. A.J. was examined, but no rape kit was collected because the last sexual encounter had occurred more than 48 to 72 hours earlier.

On July 22, 2013, Det. Mulhall received a report about Kays and a student and had Kays' school e-mail account locked. Because teachers are allowed access to highly personal information about students, and may have student records in their e-mail system, the policy for accessing JCPS e-mail is highly restricted. Det. Mulhall testified, "it's basically [the teacher] and no one else. You're not allowed to let your

neighbor use your e-mail, your wife use your e-mail, because there's constant e-mailings from the school about students."

During a subsequent interview on August 19, 2013, Kays told Det. Mulhall he had never shared his school e-mail password with anyone, no one had ever accessed his school e-mail account, and the Shawneevball Facebook account—created three years earlier—was not linked to his JCPS e-mail. In naming seven members of the school volleyball team, Kays did not mention A.J. When asked about A.J., Kays admitted she was bright, was on the team and he had simply forgotten her. In discussing the Shawneevball Facebook page, Kays said he gives the account password to all players so they can share information and pictures. In addition to the seven current players, he named five former students with access to the account. He firmly denied engaging in any chats with A.J.

When told he was accused of having inappropriate contact with a student, and after being shown the Facebook chats in which mother posed as "A.J.," he denied any contact with A.J., denied calling anyone "Babygirl," denied entering "Babygirl" in his list of JCPS e-mail contacts,[4] and denied ever being alone with A.J. After the interview, Kays signed a typed summary of the interview denying inappropriate contact with A.J. and maintaining any objectionable text messages were the work of "someone else logging into the account."

Det. Mulhall interviewed other students, one of them being Chelsea Woolfolk, a former volleyball player with whom Kays had communicated via Facebook. Woolfolk trusted Kays and continued communicating with him via the Shawneevball Facebook page after graduating. On August 3, 2013, Kays messaged Woolfolk,

> I was going through a lot of stuff and over the summer was having an inappropriate relationship with a former student. Now I'm going to lose my job, wife, access to kids, house, money, and could face some serious charges.

Testifying on behalf of the Commonwealth, Woolfolk identified the Facebook thread as being between her and Kays. She was confident the message came from Kays because elsewhere in the thread he had commented on a graduation occurrence only he could know.

Mother took A.J.'s phone, gave it to police with permission to search the contents, and forbade A.J. from contacting Kays. The phone was locked and A.J. would not reveal the passcode. When A.J. ultimately revealed the code, it was "Kays."

Unbeknownst to mother, A.J. continued communicating with Kays via her home landline, and her younger brother's cell phone onto which a Viber[5] application (app) had been downloaded, allowing A.J. and Kays to surreptitiously message each other. Upon learning of this, mother confiscated her son's cell phone and gave it to authorities. Det. Mulhall received the phone which showed only two numbers accessing Viber, one of them being assigned to Kays. Det. Mulhall took screenshots of the messages which were introduced at trial.

On September 18, 2013, Det. Mulhall interviewed Kays' now-ex-wife. Though married when the relationship with A.J. began and was revealed, they separated in July 2013, and their divorce became final

---

**4.** Identifying information for this contact included A.J.'s first and last names, cell phone number and e-mail address.

**5.** Viber is a mobile app allowing users to make phone calls and send text messages to other Viber users without charge. A user's phone number becomes his "identity."

the last week of November 2013. She testified she came home July 23, 2013, to find Kays sitting on the bed talking on the phone to the school's Athletic Director. Kays had just learned a student had made an allegation against him and in a shaky voice admitted sending romantic texts and a picture of his face to a player. While he denied sending any sexual or emotional content, he told her he felt he had cheated on her.

Kays' ex-wife's gut told her there was more to the story. She recalled seeing marks on her husband's neck earlier in the summer, which Kays now admitted were hickeys. Kays spoke of A.J.'s mother posing as "A.J." online, and claimed "A.J." "came on" to him. In mid-July he had an iPhone 4S, but since the dawn of the investigation, he had acquired an iPhone 5 [6] and told her police would not find naked photos on it—making her realize he had given the new phone to police to search. When he asked her to contact A.J.'s mom, she refused. Their marriage ended that July, the same month they celebrated their ninth wedding anniversary.

In preparation for trial, Kays filed a KRE [7] 504(b) motion to prevent his ex-wife from testifying about confidential marital communications pertaining to the case. Citing KRS 620.050(3), the trial court denied the motion because abuse of a child was alleged. Furthermore, because Kays was now divorced, there was no marriage to preserve and, thus, no basis for invoking spousal privilege.

On July 26, 2013, A.J. gave a forensic interview at which she recanted any involvement with Kays. At that point, A.J. still believed she and Kays would marry and she would become stepmother to his two young children. Shortly before the interview, A.J. had written mother a letter claiming she had cheated on Jacob with a former volleyball scorekeeper she had contacted via the team's Facebook account; mother would not approve of this boy because he drinks and uses drugs so she never brought him home; Kays "has done nothing wrong;" and, "I made everything up," putting the blame on Kays only because "I knew that you had already kind of suspected that something was going on between us." As a result of the letter, mother knew A.J. would recant her prior admissions during the forensic interview and that is what happened.

After the failed interview, mother was told to go home and pretend she believed nothing had happened—just as A.J. had said during the interview. Mother refused to take that approach. Instead, she and a friend searched the house and found two rings Kays had given A.J. The rings were hidden in A.J.'s bedroom, wrapped in a shoebox bearing the names of Kays and his wife and their phone number.

A.J. ultimately chose to tell the truth because everyone knew she was lying. As a matter of right, Kays appeals his conviction and sentence of ten years.

## ANALYSIS

Kays' first complaint is the trial court erroneously granted the Commonwealth's motion to strike a juror—Tom Heiser—for cause. As noted by the Commonwealth, Kays does not allege his jury was not impartial, only that Heiser should have been a member of the jury. Kays had "no right to the inclusion of any particular juror on the panel." *Pendleton v. Com-*

---

**6.** Kays admitted buying a new phone for himself on July 24, 2013. According to A.J., he also offered to buy her a phone, and advised her to delete messages and deny everything.

**7.** Kentucky Rules of Evidence.

*monwealth*, 83 S.W.3d 522, 527 (Ky. 2002). We reject Kays' argument.

*Voir dire* began with general questioning by the court. Before allowing counsel to question the panel, the court took a brief recess during which Heiser approached the bench to express concern for himself and his family. He said his picture appears weekly on a newspaper column and feared he would be easy to locate in the event Kays were convicted. The trial court appreciated his concern, but pointed out that in most Kentucky counties—Jefferson County being something of an exception due to its size—most people know one another and the parties to a lawsuit usually know, or at least know of, members of the jury pool and their families, a fact even truer since the advent of Google and the internet. We quote a portion of the court's conversation with Heiser:

Court: But, if you're concerned about it, and that's what really it comes down to. If you're concerned about it, then it is a concern. If that would at all impact, factor into the decision that you made— or might. The scenario would be you think a person is guilty, you think the Commonwealth has proven it beyond a reasonable doubt, but, out of concern for ...

Heiser: I think that's where this is probably headed, and that's why I wanted to bring this up ...

Court: Well, does that, I mean, is that something that you are concerned about? Do you think ...

Heiser: Yeah, I think, I think so. Uh, just, you know I mean we started to talk about penalty phase and you know, obviously, even getting before that, I would have to make the decision about guilt or innocence, and I don't know who sits in these—you know—would be sitting in the— uh, while sitting on the jury, for someone out there who did recognize... I ... uh .... I ...

Court: No, I get it .... Some people it doesn't matter to and some people it does. And, if it matters to you, then it matters.

Heiser: Yeah.

Court: And, you're saying it does matter to you?

Heiser: I think it's in the back of my mind.

Court: OK.

Heiser: Uhm. Again, not as far as the guilt or innocence goes, but ...

Court: in terms of the penalty ....

Heiser: In terms of penalty and, well, maybe as far as guilt or innocence. I don't think that it would, if I honestly felt the person were guilty, yes, that I'd be swayed one way or the other, but I'm saying now because. And now that I think about it, it's ridiculous in a way because that would almost, you know, preclude anyone who works at the *Courier Journal* or WDRB or anybody from serving.

Court: Theoretically. Yeah.

Attorneys for both the Commonwealth and Kays were in the courtroom, but not at the bench, and were not alerted to the nearly six-minute private conversation between Heiser and the court. Moments after the bench discussion ended, the court apprised all counsel of Heiser's concern about possible retaliation against him were Kays convicted. After the court had summarized the bench conversation, counsel made no motions regarding Heiser's fitness for jury service.

*Voir dire* continued another ninety minutes. Then, while the panel recessed out-

side the courtroom, counsel and the court discussed potential strikes inside the courtroom. The Commonwealth mentioned Heiser's name based on the court's prior revelation of the bench conversation. Defense counsel objected, stating he did not believe Heiser's job as a newspaper music critic gave him any higher profile than anyone else on the panel. The court agreed, but stated the real question was whether Heiser's concern, whether legitimate or not, would disqualify him from jury service. Ultimately, the court stated its belief Heiser could not serve because he was unable to say his concern about the prospect of retaliation against him and his family would not impact his ability to deliberate. The court apologized for not bringing counsel to the bench during the conversation with Heiser, but offered to replay the video of his discussion with Heiser so counsel could hear Heiser's own words. No one accepted that offer; no one asked to question Heiser further.

The Commonwealth moved to strike Heiser, but stated it would defer to the court. The court struck Heiser for cause over defense objection.

■■■■ Abuse of discretion is the standard we apply when reviewing a juror excused for cause. *Adkins v. Commonwealth*, 96 S.W.3d 779 (Ky. 2003). In determining whether to strike a juror for cause, the trial court must evaluate the totality of the venireman's responses and demeanor. "[I]mpartiality is not a technical conception . . . but a state of mind." *United States v. Wood*, 299 U.S. 123, 145, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936); *Pennington v. Commonwealth*, 316 S.W.2d 221 (Ky. 1958).

■■■■ A prospective juror who "cannot render a fair and impartial verdict on the evidence . . . shall be excused as not qualified." RCr[8] 9.36(1). So long as the trial

court "had a sound legal basis" for the ruling, it will stand. *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky. 2007), *as modified* (Apr. 9, 2008).

The true test of whether a juror should be stricken for cause is whether " . . . the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict." *Thompson v. Commonwealth*, 147 S.W.3d 22, 51 (Ky. 2004), quoting *Mabe v. Commonwealth*, 884 S.W.2d 668, 671 (Ky. 1994).

*King v. Commonwealth*, 276 S.W.3d 270, 278 (Ky. 2009).

■■■■ We have carefully reviewed Heiser's comments. While he may believe he can be located more readily because his name and photo routinely appear in a newspaper, in today's electronic world, anonymity is very rare. Nevertheless, that is Heiser's belief and that is what the trial court weighed. Although Heiser said he was not prejudiced about the case, when asked directly if his concern would "factor into the decision that you made—or might," and whether he would go against the proof even if he thought "the Commonwealth has proven [guilt] beyond a reasonable doubt," he said, "Yeah, I think, I think so." In light of that response, the trial court had a sound legal basis to strike Heiser from the panel for cause. *Shane*, 243 S.W.3d at 338. There was *no abuse of discretion* and no reason for reversal.

■■■■ That being said, this situation was not handled in textbook fashion. The better practice for the court, upon learning a venireman has a substantive question, is to immediately alert counsel and bring them to the bench to participate in the discussion. The trial court recognized that in this case, albeit too late. Counsel are not

8. Kentucky Rules of Criminal Procedure.

blameless. When the court apprised them of the conversation moments after it concluded, they could have asked that Heiser be brought back to the bench for further exploration of his concern and possible rehabilitation. Counsel could have made a similar request when potential strikes were discussed later while Heiser was still in the pool. That never happened, nor did counsel accept the court's invitation to review the video of the discussion that had occurred. The matter could have been handled better, but we discern no abuse of discretion and, therefore, no reversible error.

■ Kays' second claim is the trial court erred in admitting four categories of electronic messages—Facebook messages exchanged July 19-21, 2013, between A.J. and Shawneevball (Kays); Facebook messages exchanged August 6, 2013, between Kays and former player Chelsea Woolfolk; Viber text messages between A.J. and Kays copied from the phone of A.J.'s brother; and, text messages collected from A.J.'s phone made to and from Kays. Kays filed a pretrial motion seeking exclusion due to lack of authentication directly from Facebook. The trial court denied the motion in *limine*, giving the Commonwealth the opportunity to authenticate its proof.

■ Authentication of electronic messages is a relatively new topic for Kentucky courts. Before text messages become admissible, they must be authenticated. Stated differently, the court must be sufficiently convinced the item is what the proponent claims it is. KRE 901. We review the trial court's ruling for abuse of discretion. *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007) (citing *Woodard v. Commonwealth*, 147 S.W.3d 63 (Ky.

2004)). Abuse occurs when the ruling was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000).

In arguing for exclusion, defense counsel claimed the Commonwealth could not produce complete conversations, nor prove what they intended to introduce was complete, leaving open the possibility of exculpatory proof being placed beyond their grasp. Despite that claim, defense counsel agreed a party to a conversation can authenticate a recording or electronic posting. Counsel then argued mother had admitted posing as A.J. to entrap Kays and suggested other messages may have been manipulated. Defense counsel mentioned "spoofing"[9] and suggested electronic media is inherently suspect. He then stated Facebook messages are easier to manipulate than photos and, because Viber is more secret, it is subject to even greater manipulation.

Each item Kays sought to exclude was introduced through and identified by the person who sent or received each message. A.J. identified Facebook, Viber, and text messages she exchanged with Kays. Woolfolk identified Facebook messages she exchanged with Kays. A.J.'s mother identified Facebook messages she exchanged with Kays, and those she exchanged with Kays while posing as her daughter. Other than Kays, everyone associated with creating and sending these messages testified the items as being what they purported to be based on their personal involvement in the threads. And this was not a miniscule amount of messages—it was hundreds of messages, each one *linked* to the witness introducing it by personal knowledge. *See* Ira P. Robbins, *Writings on the Wall: The*

---

**9.** "Spoofing" refers to a scam by which an entity attempts to gain unauthorized access to a user's computer system or information by pretending to be someone else in an attempt to get sensitive information.

*Need for an Authorship-Centric Approach to the Authentication of Social-Networking Evidence,* 13 Minn. J.L. Sci. & Tech. 1, 17 (2012).

The Commonwealth's burden under KRE 901 to authenticate a writing is "slight," requiring only a *"prima facie* showing." *Ordway v. Commonwealth,* 352 S.W.3d 584, 593 (Ky. 2011) (citing *Sanders v. Commonwealth,* 301 S.W.3d 497, 501 (Ky. 2010)). A trial court may admit an item so long as it finds sufficient proof has been presented from which a jury may reasonably deem an item to be what it is proclaimed to be. Robert G. Lawson, *The Kentucky Evidence Law Handbook,* 7.00 at 495 (4th ed. 2003) (citing *Bell v. Commonwealth,* 875 S.W.2d 882, 886–87 (Ky. 1994)). While the judge determines admissibility of the item, the jury determines its authenticity and "probative force." *Id.* (Quoting *E.W. French & sons, Inc. v. General Portland Inc.* 885 F.2d 1392, 1398 (9th Cir. 1989)); *see also United States v. Mandycz,* 447 F.3d 951, 966 (6th Cir. 2006),

Under KRE 901(b), the most common way to authenticate an item is through testimony of a witness that it is "what it is claimed to be." While Kays attempts to impart a mystical, magical quality to electronic messages, we disagree. As the Commonwealth argues, they are not so different from photos. Exercising its considerable discretion, a trial court may admit a piece of evidence solely on the basis of testimony from a knowledgeable person that the item is what it purports to be and its condition has been substantially unchanged. *Grundy v. Commonwealth,* 25 S.W.3d 76, 80 (Ky. 2000). Furthermore, Kays was free to argue to the jury the messages might be incomplete or may have been manipulated. In light of the witnesses through which each piece of electronic evidence was admitted in this case, we discern no abuse of discretion and affirm.

Kays' third allegation is he should have been allowed to invoke spousal privilege under KRE 504 to prevent his ex-wife from testifying about a conversation they had while married. The Commonwealth opposed the motion. This issue was resolved nearly two decades ago and we see no reason for change.

> KRS 620.050 does not permit the exclusion of evidence because of a marital privilege in a case regarding an abused child.... Chapter 620 of the Kentucky Revised Statutes relates to the treatment of dependent, neglected and abused children. KRS 620.050 abrogates the professional-client/patient privilege, as well as the marital privilege, if it is used in the case of dependent, neglected or abused children.

*Mullins v. Commonwealth,* 956 S.W.2d 210, 211 (Ky. 1997).

Kays was tried for rape and sodomy, both in the third degree, of a fifteen-year old girl. When details of how he preyed upon his former student began unraveling, he confided in his then-wife. However, their marriage quickly crumbled and the purpose of the marital privilege—to preserve the sanctity of marriage—was no longer viable for Kays or his defunct marriage. *St. Clair v. Commonwealth,* 174 S.W.3d 474, 479 (Ky. 2005), as corrected (Oct. 24, 2005). Kays asks us to restrict application of KRS 620.050 to cases in which a spouse has reported child abuse. This we decline to do. *Mullins* remains the law in Kentucky.

The last complaint is jurors did not receive full and accurate sentencing information. While unpreserved, Kays requests palpable error review.

RCr [10] 10.26 reads:

[a] palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

We ponder whether a different mix of proof would probably have yielded a lesser sentence, and whether absence of the proof suggested by Kays wrought an error of such fundamental proportion it threatened his due process of law. *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006), as modified (May 23, 2006). Kays believes he should receive a new sentencing hearing because jurors were not told KRS 532.043 requires sex offenders to complete a five-year period of post-incarceration supervision and any violation during that time will result in an additional five years of imprisonment; pursuant to KRS 17.520(2)(a)(4), Kays is subject to lifetime registration as a sex offender; no matter how many credits Kays actually earns in prison, as a violent offender under KRS 439.3401(1)(e) and (4), credits cannot reduce his sentence below 85 percent of the sentence imposed; and, sex offenders are rarely released on parole and often serve their full sentence. Importantly, while Kays now deems these pieces of proof to be relevant,[11] he made no effort to put them before the jury. Having reviewed

the allegation and the law, we disagree and affirm.

After jurors found Kays guilty, the Commonwealth offered to recommend he serve consecutive terms of four years on the count of third-degree rape and three years on the count of third-degree sodomy. In rejecting the offer in open court, defense counsel recited several other conditions accompanying the Commonwealth's offer—lifetime registration as a sex offender; no contact with the victim or her family; an additional five years of post-incarceration supervision; identification of his crimes as violent offenses; and, waiver of the right of appeal. The offer was rejected against strenuous advice of counsel. Defense counsel's recitation of the conditions—most of them statutorily mandated consequences—demonstrates awareness of them.

At that point, the penalty phase began. The Commonwealth waived its opening statement. Defense counsel spoke about five minutes, noting Kays had no prior record, would be branded a sex offender for life, and, would never teach or coach again. Defense counsel sat down after making a plea for leniency.

Probation and Parole Officer Michelle Butts, called by the Commonwealth, was the sole witness to testify. She confirmed rape and sodomy, both in the third degree, are Class D felonies, each carrying a penalty range of one to five years. Kays' maximum potential sentence would be ten years—five years on each offense—served

---

**10.** Cited in Kays' brief, and reading similarly, KRE 103 is restricted to evidentiary rulings. It has no bearing on this case since no issues were raised about admissibility of penalty phase proof.

**11.** Kays relies on an unpublished Opinion of this Court in support of his theory: *Porter v. Commonwealth*, 2007 WL 4212044, No. 2006–CA–001473–MR (Nov. 30, 2007, unpublished) (introduction of good time and other

credits; sex offender treatment program (SOTP); sex offender registry; segregation of sex offenders from general prison population; and conduct leading to early parole was not error). Today's Opinion should not be read to say such proof is irrelevant or inadmissible, only that it is not incumbent on the Commonwealth to introduce it, although it may should it see fit to do so.

consecutively. While Kays would be classified a violent offender, he would serve twenty percent of his sentence before becoming parole eligible.

Officer Butts was asked to calculate the amount of time Kays would serve on various sentences. For example, if sentenced to ten years, he could become parole eligible after serving just twenty percent, or two years. However, because he is a sex offender, he must complete SOTP before becoming parole eligible. Until completing SOTP, he will earn, but not receive, credit; upon completion of SOTP, he will receive ninety days of credit and become eligible to earn meritorious good time and educational credit. In meeting the Parole Board, he will receive one of three outcomes—parole will be granted, parole will be deferred, or he will be required to serve out the sentence imposed.

On cross-examination, Officer Butts stated she could not predict whether Kays' first meeting with the Parole Board would be successful, saying she was unfamiliar with success rates. She then explained when considering an inmate for parole, the Board usually has before it the inmate's pre-sentence investigation report prepared by the Department of Corrections (DOC) and a pre-parole progress report prepared by the institution documenting how the inmate has adjusted to prison life—generally the DOC file. The Board can request the trial record but does not automatically receive it for review. Officer Butts could not say whether sex offenders have a tougher time adjusting to prison life. No other witnesses were called by the Commonwealth; no witnesses were called by Kays.

Very brief summations—less than five minutes total—were given. Defense counsel argued: Kays would not reoffend; jurors know what will happen to Kays in prison due to the nature of his crimes; and,

jurors should be lenient. The Commonwealth asked jurors to focus on A.J. and how Kays manipulated her with hundreds of text messages and phone calls. The prosecutor argued while Kays will go through a lot for his crimes, so will A.J., and for violating the community's trust, Kays should be sentenced to consecutive terms, with the maximum potential sentence being ten years and the minimum term being one year. The Commonwealth did not ask jurors to impose the maximum sentence. Instead, it suggested jurors begin in the middle—with five years—and go up or down from there, depending upon how heinous they deemed Kays' conduct.

■ Having described the information provided to Kays' jury, the broader question is what is required by KRS 532.055(2). The statute reads in part:

(2) Upon return of a verdict of guilty . . . the court shall conduct a sentencing hearing before the jury, if such case was tried before a jury. In the hearing the jury will determine the punishment to be imposed within the range provided elsewhere by law. The jury shall recommend whether the sentences shall be served concurrently or consecutively.

(a) Evidence may be offered by the Commonwealth relevant to sentencing including:

1. Minimum parole eligibility, prior convictions of the defendant, both felony and misdemeanor;

2. The nature of prior offenses for which he was convicted;

3. The date of the commission, date of sentencing, and date of release from confinement or supervision from all prior offenses;

4. The maximum expiration of sentence as determined by the division of probation and parole for all such current and prior offenses;

5. The defendant's status if on probation, parole, postincarceration supervision, conditional discharge, or any other form of legal release;

6. Juvenile court records of adjudications of guilt of a child for an offense that would be a felony if committed by an adult. . . .

and

7. The impact of the crime upon the victim or victims, as defined in KRS 421.500, including a description of the nature and extent of any physical, psychological, or financial harm suffered by the victim or victims;

(b) The defendant may introduce evidence in mitigation or in support of leniency;

and

(c) Upon conclusion of the proof, the court shall instruct the jury on the range of punishment and counsel for the defendant may present arguments followed by the counsel for the Commonwealth. The jury shall then retire and recommend a sentence for the defendant.

It goes without saying any information given to a jury must be accurate, but we do not read the phrase, "[e]vidence *may* be offered by the Commonwealth" (emphasis added), to require the Commonwealth to offer proof on any particular topic, and especially not on one perceived as mitigating the sentence. *Fox v. Grayson*, 317 S.W.3d 1, 13 (Ky. 2010). Most litigants would perceive a request for leniency to be the dominion of defense counsel—as reflected in KRS 532.055(2)(b) which allows the defendant to "introduce evidence in mitigation or in support of leniency."

Kays relies heavily on *Robinson v. Commonwealth*, 181 S.W.3d 30, 38 (Ky. 2005), wherein a probation and parole officer testified erroneously about the application of good time credits to parole eligibility. His mistake drew no objection and the prosecutor compounded the error by repeating it in summation. *Robinson* was reversed because "[t]he use of incorrect, or false, testimony by the prosecution is a violation of due process when the testimony is material." *Id.* (internal citation omitted)). But that is not the scenario we review today.

■ Having been convicted of two Class D felonies, Kays is a violent offender under KRS 439.3401(1)(e). Had he been convicted of a capital offense or a Class A or B felony, he would be required to serve 85 percent of the sentence imposed before becoming parole eligible. KRS 439.3401(3)(a). However, due to his crimes being Class D felonies, he will become eligible after serving just twenty percent, assuming he completes SOTP in quick fashion. *Id.* Officer Butts testified accurately. If Kays desired additional testimony, he should have asked Officer Butts or offered his own witness. We will not put the onus on the Commonwealth "to comprehensively convey to the jury all of the conflicting possibilities that surround parole eligibility." *Commonwealth v. Reneer*, 734 S.W.2d 794, 800 (Ky. 1987) (Leibson, J., dissenting).

Kays suggests jurors may have been influenced by having less than all the evidence they could have had. However, the trial court punctured that theory. After accepting the jury's recommended sentence, the judge spoke privately with jurors and shared the gist of that conversation in open court at the formal sentencing on October 21, 2014, telling Kays precisely why jurors meted out the maximum sentence. After engaging in sexual intercourse and then oral sex with a fifteen-year-old girl, Kays consistently and aggressively lied about it, "spreading harm among others who deserved better" even though he could "stop the bleeding all along."

Throughout trial, Kays focused entirely on himself—what he was losing as a result of his poor choices. The court noted one might assume the jury's decision was an emotional reaction, but that would be wrong, their concern was,

> absent remorse, absent acknowledgement and acceptance of responsibility, their responsibility is to hold you accountable. And, the degree to which you extended the life of this poor choice—criminally poor choice—by continually lying about it, is what got the ten years. If you're not gonna accept responsibility, you run the risk that the community will hold you accountable and that's what happened in this case.

In light of the trial court's comments, we are convinced no amount of testimony about a cap on earning credit, lifetime sex offender registration or post-incarceration supervision would have changed the jury's recommendation of the maximum sentence. Kays sealed his fate with his persistent lie and lack of remorse. No manifest injustice occurred. *Martin*, 207 S.W.3d at 3–5. There is no need for reversal.

For the foregoing reasons, we affirm the judgment of conviction and sentence entered by the Jefferson Circuit Court.

·ALL CONCUR.