**Gary Haven Cochran MILLS, Jr., Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 1999–SC–1146–MR.**

Supreme Court of Kentucky.

May 24, 2001.

Emily Holt, Assistant Public Advocate, Frankfort, Counsel for Appellant.

A.B. Chandler III, Attorney General of Kentucky, Dennis W. Shepherd, Assistant Attorney General, Frankfort, Counsel for Appellee.

JOHNSTONE, Justice.

Gary Mills was found guilty of complicity to intentional murder, first degree-robbery, third-degree arson, and second-degree persistent felony offender. He was sentenced to life without the possibility of parole for twenty-five years for the murder charge, life imprisonment for the robbery charge, and ten years' imprisonment on the arson charge. As required by statute, the sentences were ordered to be served concurrently. Because the trial court erred in allowing the jury to hear audio taped statements in private during its deliberations, we reverse and remand for a new trial.

William Ratliff suffered a brutal and senseless death. On March 20, 1998, his body was discovered in the hulk of a burned truck near an abandoned strip mine. He died not from the fire, but from a stab wound to the neck. Gary Mills and Melody Bowen soon became suspects in Ratliff's murder. They were arrested five days later. Two days thereafter, a grand jury indicted the pair on charges of murder, robbery, and arson. Additionally, Mills was charged with second-degree persistent felony offender and intimidating a witness. The latter charge was ultimately severed.

Bowen was indicted as the principal to the murder and robbery charge and Mills was indicted with complicity to murder. Bowen eventually entered into a plea agreement with the Commonwealth, in which she pled guilty to numerous lesser charges and was sentenced to fifteen years' imprisonment. As part of the agreement, Bowen agreed to testify against Mills at his trial.

At trial, there were two different versions of the circumstances surrounding Ratliff's death. The Commonwealth's version was based on Bowen's testimony. Mills' version was based on his own testimony. Additional witnesses were called by both sides to corroborate details of each respective version.

### BOWEN'S TESTIMONY

Bowen and Mills had been dating for about two weeks before Ratliff was murdered. According to Bowen, Mills hatched the plan to rob Ratliff. She testified that on the night of the murder, she and Mills drove by Ratliff's house. Once there, Mills let her out of the car and she went to Ratliff's house with a story about car trouble. After hearing Bowen's tale of woe, Ratliff volunteered to give her a ride.

Per Mills' instructions, Bowen directed Ratliff to where Mills and the "disabled" car were. Mills was under the hood of the car when they arrived. Mills then got into Ratliff's truck and the three of them drove away. Sometime later, Mills told Ratliff to stop the truck and pulled out a pistol, which he aimed at Ratliff. Apparently, Ratliff did not take the threat seriously. He tried to swat the gun away from Mills. Ratliff and Mills then began to fight. Bowen, while attempting to help Mills, accidently struck him instead of Ratliff.

During the fight, a knife fell out of Mills' pocket and landed in the truck's floorboard. Mills told Bowen to retrieve it. While she was retrieving the knife, Mills

shot Ratliff because "he was going to run." Mills and Bowen searched Ratliff and found two billfolds, which held substantial amounts of cash. The two tossed Ratliff in the back of the truck and drove to the abandoned strip mine, with Mills driving the truck and Bowen driving the car. Once there, they placed Ratliff in the driver's seat of the truck. Mills told Bowen to stab Ratliff, which she did. Mills set the truck on fire and they fled the scene.

They went to Mills' sister's house to clean up and count the money. Later, they burned their clothes and disposed of the knife and gun. Bowen, on her own, set her car afire in an attempt to destroy evidence.

## MILLS' TESTIMONY

According to Mills, he and Bowen were out drinking and driving when her car broke down near Ratliff's home. Bowen told him that she knew Ratliff and she would go ask him if he would give the car a jump start. Bowen left and returned with Ratliff in his truck. While the battery was charging, the threesome started drinking beer. The suggestion was made to go somewhere and drink more. All being agreeable, Mills and Bowen followed Ratliff to the abandoned strip mine.

Once there, Ratliff wanted to talk with Bowen alone. The pair walked away leaving Mills alone with the two vehicles. When Bowen and Ratliff returned, they were arguing. Mills became involved in the argument and, consequently, got into a fist fight with Ratliff. Mills was smaller than Ratliff, who soon got the best of Mills. During the fight, a gun that Mills had tucked into the back of his pants, fell to the ground. Bowen grabbed the gun. While Ratliff was on top of Mills beating him with his fists, Bowen struck Ratliff at least twice in the head with the gun. Also, she accidently hit Mills. Mills then took the

gun away from Bowen. Before he could do anything to stop her, Bowen grabbed a knife and stabbed Ratliff with it.

Mills admitted that he helped cover up the murder by burning his and Bowen's clothes and by disposing of the gun. But, he denied ever taking any money from Ratliff, shooting him, or any responsibility for his death. In Mills' own words, "[N]o sooner than I got the gun away from [Bowen] . . . she stabs [Ratliff]. . . . There wasn't nothing I could do. It wasn't my fault. It wasn't my fault."

## EXCLUSION OF INSTRUCTIONS ON LESSER–INCLUDED OFFENSES

Mills argues that, based on the evidence, he was entitled to instructions to lesser-included offenses of complicity to second-degree manslaughter and complicity to reckless homicide. We disagree.

■ Instructions on the lesser-included offenses of complicity to second-degree manslaughter and complicity to reckless homicide could only be given as a complicity to the result instruction under KRS 502.020(2). *Harper v. Commonwealth,* Ky., 43 S.W.3d 261, 266 (2001). *Id.* at 266. As we explained in *Tharp v. Commonwealth,* Ky., 40 S.W.3d 356, 361 (2000):

> [A] defendant can be found guilty of complicity to an unintentional homicide under KRS 502.020(2) if there is evidence that he/she either actively participated in the actions of the principal, or failed in a legal duty to prevent those actions, *without the intent* that those actions would result in the victim's death, but with recklessness, *i.e.,* failure to perceive a substantial and unjustifiable risk that death would result, KRS 501.020(4), supporting a conviction of reckless homicide by complicity, KRS 507.050; wantonness, *i.e.,* an awareness

of and conscious disregard of a substantial and unjustifiable risk of that result, KRS 501.020(3), supporting a conviction of manslaughter in the second degree by complicity, KRS 507.040; or aggravated wantonness, *i.e.*, wantonness creating a grave risk of death under circumstances manifesting an extreme indifference to human life, supporting a conviction of wanton murder by complicity, KRS 507.020(1)(b).

*Id.* at 361.

■ As previously stated, there were two versions of Ratliff's murder. According to Bowen, Mills plotted to rob Ratliff. And, Mills directed her to stab Ratliff prior to Mills setting the truck on fire, with Ratliff inside, and she followed those directions. This version of events would only support a finding of either complicity to intentional murder under KRS 502.020(1), or complicity to wanton murder under KRS 502.020(2). According to Mills, after he took the gun away from Bowen, she produced a knife and stabbed Ratliff in the neck and there was nothing he could do to stop her. Under Mills' version of events, there was no plan to rob Ratliff. And, it was Bowen who knew Ratliff, asked him for help, and brought him to the disabled car. His version does not support instructing on any lesser-included offenses because it does not show that Mills either solicited or engaged in a conspiracy with Bowen to stab Ratliff or aided, counseled, or attempted to aid Bowen in planning, or engaging in the stabbing of Ratliff. *See* KRS 502.020(2).

### EXCLUSION OF A SPECIFIC ACT IN THE COMPLICITY INSTRUCTION

■ Mills argues that the complicity to murder instruction should have included the specific act or acts of complicity he committed. Specifically, he argues that

the jury should have been instructed to find that he gave Bowen the knife with the intent that she use it to kill Ratliff. He tendered instructions that would have required the jury to find in pertinent part:

A: That ... [Mills] gave a knife to Melody Bowen;

And

B: That Melody Bowen intended to use the knife for the purpose of killing William Ratliff by cutting his throat;

And

C: That when [Mills] gave the knife to Melody Bowen, [Mills] knew Melody Bowen intended to kill William Walker Ratliff by cutting his throat with the knife and that the knife would provide her with the means to do so

The trial court did not submit the defense's tendered instruction; rather, the trial court's instruction to the jury on the complicity to murder charge echoed the elements of complicity set forth in KRS 502.020(2):

A: That ... Melody Mollette Bowen killed William Walker Ratliff by stabbing him with a knife;

B: That in so doing Melody Mollette Bowen caused the death of William Walker Ratliff intentionally;

C: That prior to the stabbing of William Walker Ratliff by Melody Mollette Bowen ... [Mills] either solicited, commanded, or conspired with Melody Mollette Bowen to engage in the conduct which resulted in the death of William Walker Ratliff, or aided, counseled, or attempted to aid Melody Mollette Bowen in planning or committing the conduct performed by her which caused the death of William Walker Ratliff....

■ The complicity to murder instruction given by the trial court in this case was sufficient. The complicity instruction tendered by Walker is not re-

quired by case law or by the plain language of KRS 502.020. Unlike a murder instruction where the cause of death, *e.g.* strangulation, stabbing, shooting with a gun, etc., is readily ascertainable, the acts giving rise to accomplice liability are not so readily defined and may encompass a continuum of events. As in this case, not only did Bowen testify that Mills supplied her with the knife and directed her to stab Ratliff, but she also testified that he arranged the ruse with the car and that he earlier in time indicated that he knew where they could get some money. Thus, complicity liability often will not depend on a particular act, but on many different acts that occur at different points in time. Moreover, it may well be that it is only the accumulation of acts that serves to prove complicity. In other words, no particular act in and of itself would serve as the defining act that, under Mills' argument, should be included in a complicity instruction. There was no error.

### WITNESS INTERVIEW TAPES

■ At the conclusion of the Commonwealth's case, the Commonwealth moved to admit taped statements by various witnesses who testified at trial. These statements were in the form of taped interviews between the witnesses and the Kentucky State Police. The Commonwealth did not want the tapes played during trial. Rather, the Commonwealth wanted the tapes available for the jury to review during deliberations. The defense objected on lack of foundation, on grounds that the tapes were inadmissible prior consistent statements that only served to bolster prior testimony, and on grounds that the evidence was substantially more prejudicial than probative and should be excluded under KRE 403. The trial court ruled that the tapes were admissible—for the purpose of jury review during delibera-

tions—subject to the Commonwealth laying a proper foundation.

After reviewing the tapes, the defense objected to the introduction of the tapes on the additional ground that the tapes needed to be redacted to eliminate evidence of other crimes. In response to these objections, the trial court redacted some or all of the tapes in part. But the trial court still made the tapes available for the jury to review. In its charge to the jury before it began deliberating, the trial court stated in pertinent part:

> Additionally, these exhibits, one exhibit I think is four or five tapes. If you want to listen to those you can, but you don't have a machine to do that and that's strictly up to you and if so, you can inform the Bailiff and I will see that you have a machine to do that.

The record shows that the jury did in fact ask for a machine during its deliberation in order to review the tapes.

After the jury returned its verdict in the guilt or innocence phase of the trial, but before the sentencing phase, the defense moved for a mistrial on grounds that allowing the jury to hear the tapes violated RCr 9.74, which provides:

> No information requested by the jury or any juror after the jury has retired for deliberation shall be given except in open court in the presence of the defendant (unless the defendant is being tried in absentia) and the entire jury, and in the presence of or after reasonable notice to counsel for the parties.

This rule was clearly violated when the jury was allowed to play the tapes in the privacy of the jury room. The tapes were not played in open court. Neither Mills nor his counsel was present when the tapes were played. Finally, it does not appear that counsel was notified prior to the jury's request for a machine to play the tapes.

372

In *Lett v. Commonwealth*, Ky., 284 Ky. 267, 144 S.W.2d 505 (1940), the jury, after it had begun its deliberations, requested to hear the court reporter read a portion of a witness's statement. The trial court agreed to the request and did not notify defense counsel prior to allowing the jury to hear the evidence. The *Lett* Court held that this violated a then-current criminal rule that provided:

> After the jury retires for deliberation, if there be a disagreement between them as to any part of the evidence, * * * they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to, the counsel of the parties.

*Id.* at 509 (asterisks in the original).

In holding the error to be reversible even though there was no allegation of prejudice, the *Lett* Court stated:

> It has been recognized since time immemorial, under the common law, the federal and our Constitution, that when one is charged with a felony the trial must be had in the presence of the accused, and that the accused has the right to be heard by himself and counsel. The Code provision makes it quite plain that if there be disagreement as to evidence—which must have existed here, else no reason for the request—any elucidation must not be had without notice to counsel. The reason is obvious, and particularly applicable here, where the witness had given contradictory testimony. It is beyond our power to make a rational guess as to the effect of the failure to have re-read the contradictory evidence.

*Id.*

The factual differences in this case weigh in Mills' favor and not against him as argued by the Commonwealth.

Most of the Commonwealth's brief on this issue is devoted to the admissibility of the tapes as prior inconsistent statements. Nothing in the record shows that a proper foundation was laid for admitting the statements under KRE 613 in this case; thus, the statements were inadmissible. Perhaps more importantly, the error goes far beyond violating a rule of evidence. Unlike the transcript re-read in *Lett,* the interview tapes were never heard by the jury during the trial in the presence of Mills and his counsel. The statements were never subjected to adversarial testing. Allowing the jury to hear these tapes in the manner described above was an error of serious constitutional magnitude.

For the reasons set forth above, the judgment of the Johnson Circuit Court is hereby reversed and this case is remanded for a new trial.

LAMBERT, C.J.; COOPER, GRAVES, KELLER, and STUMBO, JJ., concur.

WINTERSHEIMER, J., concurs in result only.