# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: APRIL 28, 2022
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0032-MR

ALFRED T. KESSEH                                        APPELLANT

|   | ON APPEAL FROM JEFFERSON CIRCUIT COURT |
|---|---|
| V. | HONORABLE A.C. MCKAY CHAUVIN, JUDGE |
|   | NOS. 19-CR-00237 & 19-CR-00638 |

COMMONWEALTH OF KENTUCKY                      APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

For roughly six weeks, students at the University of Louisville reported a series of robberies, burglaries, and a sexual assault for which the appellant, Alfred T. Kesseh, was ultimately charged and convicted. Prior to trial, Kesseh moved the court to sever the first-degree rape, first-degree robbery, and first-degree burglary charges, which all involved the same victim, from the remainder of the charges. The trial court denied Kesseh's motion to sever, which Kesseh argues was an abuse of discretion. Additionally, Kesseh alleges a bevy of errors by both the trial court and the Commonwealth resulted in undue prejudice. Finding none of Kesseh's claims meritorious, we affirm.

## I. Factual and Procedural Background

The facts of this case are numerous and complicated, but largely undisputed. Beginning on December 7, 2018, Kesseh engaged in a crime spree

involving robbery, burglary, and culminating in rape, which lasted until he was arrested by the Louisville Metropolitan Police Department (LMPD) on January 14, 2019. During that time Kesseh operated in and around the University of Louisville campus.

After midnight, on December 7, Jason Schreiber was about to enter his home at the Cardinal Towne Apartment Complex when he noticed the front door was ajar. Schreiber called the police and waited for their arrival to reenter. However, by the time police arrived and searched the apartment Kesseh had already left. Schreiber, along with his roommates, reported that they were missing several electronics, including laptops and cameras, as well as their backpacks. Surveillance footage showed Kesseh exiting the apartment with two backpacks which Schreiber later identified as belonging to himself and his roommate.[1]

Roughly a week later, on December 14, Paulo Robenboim noticed that his bank card had gone missing and checked his recent purchases, which showed that his card had been used at a Speedway and a McDonald's which he had not visited. When the Speedway manager reviewed their surveillance video, he identified the man using the card as matching Kesseh's description.

Four days later, on December 18, Kesseh once again visited the Cardinal Towne Apartment Complex, breaking into three apartments. Unlike the first incident, however, the victims were home when Kesseh entered. The first

---

[1] Kesseh was arrested while carrying one of these backpacks.

victim, Erin Kidwell, testified that Kesseh entered her home around three o' clock that morning, made enough noise to wake her, and then stuck his head into her bedroom while she laid still. According to Kidwell, Kesseh remained in her home for several minutes before leaving and did not steal anything. As with his previous visit to the complex, surveillance footage confirmed Kesseh roaming the halls of the apartment complex at the corresponding time and day. That same evening, Kidwell's apartment neighbor, Nikayla McFarland, reported having her laptop stolen. As with the previous incidents, surveillance footage showed Kesseh in the apartment hallway holding the stolen laptop.

Kesseh capped off his December 18 spree by burglarizing Ali Conder's apartment. At the time of the burglary, Conder was hosting two individuals, Grecia Sosa and Devon Rose, for the evening. Kesseh reportedly took a wrapped Christmas gift, a PlayStation gaming console, a laptop and charger, along with Sosa's wallet. As with the previous burglaries, Kesseh was identified in the hallway, opening up Conder's apartment door. Additionally, Kesseh was identified on surveillance footage at White Castle, where he had used Sosa's debit card to purchase a meal.

Four days passed before Kesseh committed another burglary at the Cardinal Towne Apartment Complex, this time at the home of Jacquayah Washington and Madison McCellon. At the time of the burglary McCellon was working, and not at home. The roommates reported that several video game consoles and paraphernalia were stolen along with a speaker and other items. Once again, video surveillance showed Kesseh leaving the apartment with a

stolen item in hand.  Following a several weeks hiatus, Kesseh visited the University Pointe Apartment Complex and entered Allison Kirk and Sarah Delaney's home just past midnight.  Delaney testified that she heard the apartment door open, but assumed it was her roommate's boyfriend leaving. The following morning, when the two women awoke, they discovered a missing wallet and laptop.  When Delaney checked her mobile banking application, she saw several unauthorized purchases.  Notably, employees from two of those establishments later identified Kesseh as the man using Delaney's card to make the purchases in question.  Additionally, when Kesseh was eventually arrested he was in possession of Kirk's laptop.[2]

Only two days after the previous burglary, Kesseh revisited the University Pointe Apartment Complex on January 9, 2019 and broke into Justin Wells's apartment.  Unfortunately, when Wells went to investigate the noises he heard in the kitchen he was confronted by Kesseh who brandished a pistol at him, demanding valuables and threatening to kill Wells.  However, Wells stated that he recognized an orange tip on the gun (often denoting a toy, or non-lethal weapon) and rebuffed Kesseh's demands.  Kesseh left without further incident and Wells called the police.  Apparently unperturbed, Kesseh immediately found another apartment to burglarize and entered the home of roommates, Skylar McGimsey, Kaitlin Armstrong, Sabrina Eden, and Kylie Meehan. Instead of remaining in common living spaces, Kesseh escalated his behavior

---

[2] Kesseh had changed the login information to his name and was logged into his Facebook account on the stolen computer.

by entering Meehan's room and getting into bed with her. Kesseh briefly stayed in bed with Meehan before standing up and telling Meehan to turn around. When she had complied Kesseh pulled out his toy gun and placed it on Meehan's back and demanded money. Meehan complied and gave him the pin number to her bank card.

All the while, a fourth individual, Connor Dean, who was visiting Armstrong, went to investigate the noise previously heard in the common areas. Dean stated that he noted an unfamiliar backpack, inside of which he found a laptop which he turned on, seeing the name "Alfred" on the loading screen. At this moment Kesseh walked out of Meehan's bedroom. Seeing Kesseh leave Meehan's room, Dean assumed he was an invited guest and offered the stolen backpack and laptop back to him. Kesseh took the items and exited the apartment. Surveillance footage showed Kesseh in the hallway at the time and wearing the hat he had stolen from Meehan's room. Kesseh left University Pointe before officers could arrive.

Immediately thereafter, Kesseh returned to the Cardinal Towne Apartment Complex and entered T.D.'s apartment at six o' clock in the morning. When T.D. heard noise in the kitchen she opened her bedroom door to investigate and startled Kesseh, who immediately pointed the fake gun at her. Kesseh approached T.D., ordered her to turn around and marched her into her bedroom. Kesseh asked T.D. who else was home but T.D. lied and told him she was alone. While robbing her, Kesseh commented on her attractiveness. Eventually he kissed her and asked T.D., "do you want to do

this?" to which T.D. replied, "no." Unperturbed, Kesseh continued with his unwanted advances and eventually sexually assaulted and raped T.D. When the ordeal passed Kesseh threatened T.D. with death if she told anyone about what had just occurred. Immediately thereafter he left the apartment with T.D.'s phone, Apple Watch, and a pair of gray Nike pants.[3] T.D. immediately reported the crime and was taken to the Center for Women and Families for a Sexual Assault Nurse's Examination. The results of the examination revealed DNA which matched Kesseh's.

Kesseh's final burglary occurred on January 11, 2019 when he was observed in the Louisville ESPN radio station offices rifling through desks. Kesseh left before he could be apprehended. LMPD was finally able to capture Kesseh on January 14, 2019 near the University of Louisville residence halls and in possession of numerous stolen items. Kesseh was indicted on 24 counts, including burglary, robbery, theft, fraudulent use of a credit card, and rape.[4] Prior to trial Kesseh moved to sever the charges relating to T.D. from the remainder of the counts, but the trial court denied the motion. Kesseh was ultimately convicted and sentenced to a total of twenty-seven years of imprisonment. However, prior to final sentencing Kesseh attempted to call T.D. from jail, for which the trial court held him in contempt and sentenced him to

---

[3] At the time of his arrest, these pants were in Kesseh's possession.

[4] These charges originally stemmed from two indictments, 19-CR-0237 and 19-CR-0638. Those cases were consolidated and form the basis of the original conviction and this appeal.

serve an additional six-months consecutive to his underlying sentence. Kesseh appeals the judgment.

## II. Analysis

### I. RCr[5] 6.18 and 8.31.

Kesseh argues that the three charges (rape, burglary, and robbery) related to T.D. were too dissimilar from the other counts that the denial of his motion to sever amounted to reversible error. Kesseh further requests severing the charges into a number of cases, arguing that he is entitled to eight separate trials. In order to succeed on these challenges Kesseh must prove that combining these charges into one case severely prejudiced him and resulted in a fundamentally unfair sentence.

RCr 6.18 allows more than one offense to be charged together so long as the offenses are "of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan." In turn, RCr 8.31 establishes boundaries, requiring that "[i]f it appears that a defendant or the Commonwealth is or will be prejudiced by a joinder of offenses or of defendants in an indictment, information, complaint or uniform citation or by joinder for trial, the court shall order separate trials of counts, grant separate trials of defendants or provide whatever other relief justice requires." Since trial courts are in the best position to strike the proper balance between RCr 6.18 and RCr 8.31, they are afforded "great discretion"

---

[5] Kentucky Rules of Criminal Procedure.

when determining whether to "join or sever offenses." *Davidson v. Commonwealth*, 548 S.W.3d 255, 258 (Ky. 2018) (citation omitted); *Smith v. Commonwealth*, 520 S.W.3d 340, 353 (Ky. 2017). Consequently, we do not disturb their judgment on these issues "absent a showing of clear abuse and actual prejudice." *Davidson*, 548 S.W.3d at 258; *see also Peacher v. Commonwealth*, 391 S.W.3d 821, 838 (Ky. 2013) ("we have many times noted that an erroneous severance ruling does not justify appellate relief unless it resulted in actual prejudice to the party opposing the ruling[]").

While it may often be required for the Commonwealth to establish that the crimes of which a defendant is charged were part of a "common scheme or plan" by presenting the jury evidence regarding time and proximity, those elements are not enough, on their own, to satisfy RCr 6.18. *Hammond v. Commonwealth*, 366 S.W.3d 425, 428-29 (Ky. 2012). Likewise, RCr 6.18 is not satisfied because a defendant is charged with multiple counts of the same crime. *Id.* at 429. Instead, as this Court has stated, the better approach is to determine "[i]f evidence from one of the offenses joined in the indictment would be admissible in a separate trial of the other offenses[.]" *Cohron v. Commonwealth*, 306 S.W.3d 489, 493 (Ky. 2010).

In *Furnish v. Commonwealth*, we applied this rule and affirmed the trial court's consolidation of a burglary and murder involving the same victim at the same home where both crimes were perpetrated. 95 S.W.3d 34 (Ky. 2002). In *Furnish*, the defendant, while working as a carpet cleaner, entered the victim's home and stole jewelry. *Id.* at 40. A month later, the defendant broke into that

8

same home and murdered the homeowner. *Id.* The trial court denied Furnish's motion to have the charges severed. *Id.* at 52-53. Affirming the denial, this Court stated that Furnish's prior visit to the victim's home was probative because it showed that he was aware of the house and its contents. Such evidence tended to establish "identity, motive, and part of a plan for criminal action." *Id.* at 52. This Court concluded its reasoning by noting that joining charges will almost always result in prejudice but may nonetheless be probative and relevant and well within the bounds of RCr 6.18. *Id.* at 53.

Conversely, in *Rearick v. Commonwealth*, we reversed a trial court's consolidation in a case involving three indictments of sexual abuse committed against three different juvenile victims. 858 S.W.2d 185 (Ky. 1993). Despite all being minors, the victims shared no other characteristics, nor were the specific incidents reflective of a theme or common plan. Since no evidence of the other incidents could be introduced at a trial of the other two, had they not been consolidated, joinder was improper. *Id.* at 187. Unlike in *Rearick*, the charges in this case share a multitude of relevant similarities and the trial court did not abuse its discretion in consolidating the indictments. We address each of Kesseh's factual assertions in turn.

1. The charges related to T.D.:

We note from the outset that the incident with T.D. followed the exact same factual pattern as the other reported burglaries and robberies. Kesseh entered the apartment in the early morning hours and began rummaging through the common areas, looking for valuables. When Kesseh was

confronted by T.D. he acted exactly as he did with Wells and Meehan, he brandished the toy gun. The only difference between these three incidents is that Wells recognized the weapon as a toy and did not capitulate, whereas T.D. and Meehan both believed their lives to be in danger and complied. Furthermore, the fact that Kesseh took T.D. into her bedroom was not an outlier. Testimony at trial showed that Kesseh had several times before entered a female victim's bedroom. In fact, that same morning, after the initial encounter with Wells, Kesseh found an apartment shared by four women and entered two of their bedrooms. With regards to Eden's, her testimony stated that he simply peered into her room before leaving. However, Meehan's testimony stated that he climbed into bed with her, consistent with the Commonwealth's theory of escalating behavior. Consequently, given these similarities, any argument by Kesseh that his incident with T.D. differed in character from the other charges is belied by the record. Finally, we note that simply because rape required an intent not present in the remaining charges is not enough to require severance. When weighed against the remaining charges, the trial court correctly found the single incident of rape and assault insufficient to require severance under RCr 8.31.

2. The gun charges:

On appeal, Kesseh argues simultaneously that the four charges involving the toy gun must be severed from the remainder of the charges, while also asserting that charges 17 and 18 (those involving Wells) and charges 19 and 20 (those involving Meehan) must be severed from one another. Although Kesseh

relies solely on the presence of the toy guns to support his position of severing charges 17-20 from the remainder of the counts, the discordance between the encounters stems from the location inside the apartments where he encountered the victims. Kesseh encountered Wells in the kitchen, brandished the toy gun defensively and demanded Wells's possessions. When Wells recognized the orange tip on the weapon and refused to comply Kesseh left the apartment without further incident. By contrast, Meehan was confronted in her bedroom, requiring Kesseh to leave the familiar confines of common spaces in his previous burglaries. To quote Kesseh's brief, the Wells robbery "indicat[ed] an intent to avoid others but to use force if encountered," while robbing Meehan "indicat[ed] that he no longer avoided others."

Kesseh's position is unpersuasive. At trial, and on appeal, the Commonwealth asserts that Kesseh's behavior indicated a common scheme, burgling student apartments, while also showing that he was becoming bolder and escalating his behavior. The robberies involving Kesseh's toy gun are probative for that reason. The trial court did not err in consolidating these charges. We are compelled to note the irony in Kesseh's argument that severance is required because each incident is clearly unique, while in the same breath declaring that Kesseh's behavior escalated until he no longer sought to avoid his victims. The Commonwealth relied on the same theory in support of joinder.

11

3. The remaining charges:

In addition to requesting severance for the charges involving sexual assault and the toy gun, Kesseh asserts that we should sever the remaining charges against him. Specifically, Kesseh seeks to sever the charges in jury instructions 4 from charges in instructions 5 and 6[6] and all three charges from those in jury instructions 7-9.[7] In addition, Kesseh seeks further delineation by severing the charge in jury instruction 3[8] and those charges laid out in jury instructions 12-16[9] from the remainder of the charges. Finally, Kesseh seeks to sever the burglary of the ESPN radio office in Louisville from all of the other charges.

Kesseh's position is unavailing because he relies on the quality of evidence presented by the Commonwealth at trial, which is a task for the jury to weigh. *See Ross v. Commonwealth,* 531 S.W.3d 471, 477 (Ky. 2017) ("Assessing the credibility of a witness and the weight given to her testimony rests within the unique province of the jury [or finder-of-fact][]") (internal quotations and citation omitted). As Kesseh's brief concedes, the charges in

---

[6] Jury instruction 4: Burglary in the Second Degree at 1830 S. Third St. Apt. 1343; Jury instruction 5: Burglary in the Second Degree at 325 W. Cardinal Blvd Apt. 1107; Jury instruction 6: Theft by Unlawful Taking over $500.

[7] Jury instruction 7: Burglary in the Second Degree at 325 W. Cardinal Blvd. Apt. 1466; Jury instruction 8: Theft by Unlawful Taking over $500; Jury instruction 9: Fraudulent use of Credit Card under $500.

[8] Jury instruction 3: Theft by Unlawful Taking under $500.

[9] Jury instruction 12: Burglary in Second Degree at 2108 Unity Place Apt. 112A; Jury instruction 13: Theft by Unlawful Taking over $500; Jury instruction 14: Theft by Unlawful Taking under $500; Jury instruction 15: Fraudulent use of a credit card under $500; Jury instruction 16: Fraudulent use of a credit card under $500.

12

jury instructions 4-9 occurred on the same night and at the same locations he had previously burgled. That footage would be relevant in either case as establishing his presence at the location on the night of the burglaries. The same may be said of the security footage showing his use of the stolen bank cards. That information was relevant to show that the man on the security footage at the apartment complex was Kesseh, because he was observed using the stolen bank cards to make purchases. While Kesseh correctly notes some differences in clothing and accessories between the different clips, that argument was properly made to the jury because it refers to the strength of the evidence. Finally, while the burglary at the ESPN radio building did differ in character from Kesseh's previous burglaries, any error by the court to join the charge was not material. The radio building was adjacent to Cardinal Towne Apartments, the burglary occurred the day following the attempted robbery of Wells and the assault on T.D. and was accompanied by overwhelming evidence tying Kesseh to the charge. Consequently, Kesseh fails to show actual and undue prejudice resulted from joining that burglary with the remaining charges. Reversal is unwarranted in this case.

## II. The disc presented to the jury during deliberation.

Having determined that the trial court did not abuse its discretion in consolidating the charges, we turn to Kesseh's next allegation of error: that the digital copies of surveillance videos prepared for the jury by the Commonwealth at the trial court's request resulted in undue prejudice and constituted reversible error. Following the close of proof, the Commonwealth prepared a

13

copy of all the surveillance videos shown at trial for the jury to take into the deliberation room. Kesseh asserts that the organization of the video clips and the titles used by the Commonwealth created an impermissible flowchart.

As an initial matter, concerning preservation, we note RCr 9.22 requires parties to

> make[] known to the court the action which that party desires the court to take or any objection to the action of the court, and on request of the court, the grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice that party.

In this case, Kesseh's counsel failed to object to the file names when they were introduced at trial by the Commonwealth's witnesses and did not object to the file names on the disc which was presented to the jury.[10] Consequently we review the matter only for palpable error pursuant to RCr 10.26.

> Under RCr 10.26, an unpreserved error may generally be noticed on appeal *if* the error is palpable and *if* it affects the substantial rights of a party. Even then, relief is appropriate only upon a determination that manifest injustice resulted from the error. For an error to rise to the level of palpable, it must be easily perceptible, plain, obvious and readily noticeable.

*Martin v. Commonwealth*, 409 S.W.3d 340, 344 (Ky. 2013) (internal quotations omitted). Manifest injustice is present when a "defect in the proceeding [exists that is] shocking or jurisprudentially intolerable." *Martin v. Commonwealth*,

---

[10] The record is silent as to whether Kesseh ever reviewed the disc, however, both parties agree that the creation of the disc was discussed at length in a private conference with the judge, and that Kesseh was aware the disc would be presented to the jury well before the conclusion of proof. His assertion that he would have objected to the titles during trial is unsupported by the record and does not satisfy the requirements of RCr 9.22.

14

207 S.W.3d 1, 4 (Ky. 2006). Consequently, we will find palpable error when the defendant suffers a "manifest injustice, either through the probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Jones v. Commonwealth*, 331 S.W.3d 249, 256 (Ky. 2011) (internal quotation marks omitted).

RCr 9.72 allows jurors to "take all papers and other things received as evidence in the case." Given the extensive nature of the charges against Kesseh, the trial court directed the Commonwealth to prepare a digital copy of all the surveillance footage presented at trial. The result was a disc containing ten folders which corresponded to twenty-three charges. Inside of each folder was a series of files containing the video clips presented during trial. Kesseh's first allegation of error relates to the organization of those discs and the titles given the video clips, such as "cT1108 C 1st floor Hallway to 1108" and "CT 1108 E Suspect Walking towards East Exit 1st Floor." Kesseh claims that the organization of the folders and the titles given to several of the video clips amounted to a flow-chart and impermissibly lowered the Commonwealth's burden of proof.

In support of his position, Kesseh cites *Mills v. Commonwealth*, 44 S.W.3d 366 (Ky. 2001), in which the jury heard recorded witness interviews which were not played at trial. *Id.* at 371. The defense objected on the grounds that the statements were inadmissible prior consistent statements. *Id.* The trial court overruled the objection and the tapes were made available to the jury. *Id.* This Court reversed the conviction, citing the testimonial nature of

15

the recordings and the fact that they were not properly admitted at trial. *Id.* at 372. Unlike in *Mills,* however, the Commonwealth here took sufficient care to introduce the video clips at trial. Witnesses identified the hallways outside of their apartments as well as the stolen property being carried off by the individual in the surveillance footage. Heather Hadden, the assistant manager of the two apartment buildings,[11] testified with regards to how the video clips were gathered and labeled. Finally, Detective Brown testified that the titles of the clips he used during his investigation were provided by the managers of the apartment complex and businesses. While titles could become testimonial in nature, the inclusion of the word "suspect" in a label or identifying a hallway location does not meet that threshold. Given that the video clips were admitted at trial and subject to cross-examination by the defense, their inclusion in the jury deliberation room meets the requirements of RCr 9.72. No error occurred.

### III. Video clips admitted into evidence without a time stamp.

Kesseh's allges that, because several video clips were not accompanied by an "on screen" time stamp, those videos are inadmissible because they fail to show that he was present at the time of the burglaries. These deficiencies, according to Kesseh, render the offending video clips inadmissible under KRE[12] 901's requirements for authentication and identification. We review the trial court's decision to admit evidence for abuse of discretion. *Anderson v.*

---

[11] University Pointe and Cardinal Towne Apartments are owned by the same company, of which Ms. Hadden was the assistant manager.

[12] Kentucky Rules of Evidence.

*Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007). Consequently, we do not disturb the trial court's ruling unless the decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* (citation omitted).

In order to admit evidence under KRE 901(a), the party attempting to introduce the evidence must provide "evidence sufficient to support a finding that the matter in question is what its proponent claims." KRE 901(b) provides several, non-limiting, examples which demonstrate how evidence may be properly authenticated; such as: KRE 901(b)(1) "[t]estimony of a witness with knowledge[;]" KRE 901(b)(4) "[d]istinctive characteristics and the like[;]" and KRE 901(b)(9) "[e]vidence describing a process or system used to produce a result[.]" KRE 901(a) treats questions of identification and authentication as matters of conditional relevancy. *Johnson v. Commonwealth*, 134 S.W.3d 563, 566 (Ky. 2004). This initial burden on the proponent is "slight" and "requires only a prima facie showing of authenticity[.]" *Id.* (citation omitted).

In this case, the Commonwealth presented the jury with Hadden's testimony. Hadden, the assistant manager of the two apartment complexes involved, testified that Detective Brown approached the organization and requested surveillance footage from the relevant dates. Hadden testified that she and another (unidentified) employee compiled the video clips for Detective Brown. Hadden testified that although not all clips contained a time-stamp, the server containing the surveillance footage was searchable by time and date which could then generate the relevant footage. Hadden testified that this process was followed and that no alterations to the video clips were made.

17

Detective Brown testified that the parameters he provided to the managing company for surveillance footage were based on victim statements and the Computer-Aided Dispatch Report. When Detective Brown identified a time frame from these reports, he requested footage for one-half hour before and one-half hour after the crime was reported to have occurred. Thereafter, Detective Brown testified that he reviewed the footage with the company prior to their creating the disc containing the relevant footage. Finally, Detective Brown testified that he also requested that each clip be identified by date and time. Unfortunately, not all files were labeled in this manner. Nonetheless, at trial the witnesses reviewed the footage, identifying the location in the films, along with stolen items, such as the hats and stereo equipment. Although no direct eyewitnesses authenticated the scenes depicted in the video clips, the Commonwealth presented sufficient testimony to properly contextualize and identify the surveillance footage in accordance with KRE 901. Consequently, the trial court did not abuse its discretion in admitting the footage into evidence.

### IV. Alleged prosecutorial misconduct.

Kesseh alleges three instances of prosecutorial misconduct, the first occurring during the guilt phase closing statements when the Commonwealth addressed the value of stolen property for which Kesseh was charged: five counts of theft by unlawful taking over $500.[13] Since Kesseh properly

---

[13] KRS 514.030, under which Kesseh was charged, was amended in 2021 to raise the felony threshold of theft from $500 to $1,000.

18

objected, we will reverse if the proof of guilt was not otherwise overwhelming and the trial court failed to cure any misconduct with a sufficient admonition. *Brafman v. Commonwealth*, 612 S.W.3d 850, 861 (Ky. 2020). Because the trial court overruled Kesseh's objection and did not admonish the jury, our review is functionally limited to determining whether the proof of guilt presented to the jury regarding the value of the stolen property was overwhelming.

The second claim of error also originates from the Commonwealth's closing statements in which it identified "twenty plus eyewitness ID's." The third claim of error occurred during the penalty phase when Kesseh alleges that testimony of two of the Commonwealth's witnesses mischaracterized the meaning of "conditionally discharged" and materially influenced the jury's decision to recommend a twenty-seven-year sentence for his convictions. Kesseh concedes that the latter two alleged errors are unpreserved and are only reviewable for palpable error. *Id.* Consequently, we will not reverse unless "the alleged misconduct was flagrant[.]" Conduct is flagrant "if it render[ed] the trial fundamentally unfair." *Id.* (internal quotations and citation omitted). Four factors aid the Court in determining whether a prosecutor's improper conduct is sufficiently flagrant to require reversal:

> (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused. We look at the claimed error in context to determine whether, as a whole, the trial was rendered fundamentally unfair.

*Id.* (citations omitted).

19

1. Assessing the value of the stolen property:

Of the twenty-four counts for which Kesseh was ultimately convicted, five involved KRS 514.030, theft by unlawful taking over $500, a Class D felony at the time of trial. Kesseh asserts that the Commonwealth failed to present sufficient evidence to establish the value of the stolen property relevant to each count and then incorrectly stated the legal standard by which the jury was required to assess the value of the property. In *Tussey v. Commonwealth*, we established that "the value of the stolen property on the date the offender receives it is proper for determining the severity of the violation." 589 S.W.2d 215, 215 (Ky. 1979). We concluded in *Tussey*, when referring to depreciation, that it would "contradict all theories of fairness" to hold individuals accountable for "an act unrelated to his or her own criminal liability[.]" *Id.* at 216. Of course, value must be determined somehow, and in *Commonwealth v. Reed*, we affirmed that owners are competent to testify regarding the value of their property so long as they give "sufficient detail for the jury to make a value determination." 57 S.W.3d 269, 271 (Ky. 2001).

Kesseh is correct that the Commonwealth misstated the relevant law to the jury by claiming that: "the value is the cost. Ask anybody how they value the things that they own and it's how much they spent to purchase it. Now most of these kids were students. Their computers, their laptops were relatively new. Their electronics were relatively new. It doesn't say anything in here about depreciated value." This statement was a clear misrepresentation of the law as it relates to valuing stolen property for the purposes of KRS 514.030.

20

However, at its core this issue asks whether, despite the misstatement, the Commonwealth provided overwhelming evidence of Kesseh's guilt. We conclude that it did.

The five victims the Commonwealth questioned over the course of three days each testified as to the value of their stolen property. Kirk testified that the value of her laptop was $1,200. Washington testified that the total value of stolen property for her Playstation 4, Nintendo Switch, and speaker was roughly $780. Rose testified that his laptop was worth roughly $1,000. Meanwhile, McFarland testified that her laptop was worth $800. Finally, Schreiber testified that his laptop, X-box 360, and camera were worth about $2,000. This testimony satisfied the Commonwealth's burden, is well in line with our precedent, and consequently does not meet the threshold for reversal. *See, e.g., Reed*, 57 S.W.3d at 270; *Poteet v. Commonwealth*, 556 S.W.2d 893, 895-96 (Ky. 1977); *Mitchell v. Commonwealth*, 538 S.W.3d 326, 328 (Ky. App. 2017); *Meyer v. Commonwealth*, 393 S.W.3d 46, 55 (Ky. App. 2013).

2. The closing statement:

Near the conclusion of the Commonwealth's closing statements, counsel stated the following:

> We're not asking you to just accept one witness ID. We're not asking you to accept even the twenty plus eyewitness ID's. We're asking you to weigh it with the video, with the evidence that he had in his possession at the time, with the DNA. We're asking you to rely on all of the evidence. The piles of evidence that link him to every single one of these offenses. That link him to every single violation, every one of those students at U of L. We're asking you to find him guilty of each and every one of these offenses that he committed.

21

Kesseh asserts that by incorrectly claiming that he was identified by twenty witnesses, the Commonwealth committed reversible misconduct. We disagree. As we have stated, prosecutorial conduct is judged for flagrancy by considering whether the remarks misled or prejudiced the jury, whether the remarks were isolated or extensive, whether those remarks appeared to have been deliberate, and finally, we look at the strength of the evidence against the defendant. *Brafman*, 612 S.W.3d at 861. In *Duncan v. Commonwealth*, the principal case on which Kesseh relies, the prosecuting attorney relied on testimony which simply stated that the defendant "could not be excluded as a source of the DNA[.]" The Commonwealth then proceeded to make an extraordinary rhetorical leap when it inferred that because the defendant could not be excluded as a source, the jury was required to find that it was the defendant's DNA on the victim's clothing. 322 S.W.3d 81, 91 (Ky. 2010). Inferring that the DNA evidence "pin-pointed" the defendant was "highly improper and, given the immense weight jurors are apt to accord DNA evidence, rendered [the defendant's] trial manifestly unfair." *Id.* at 93. The Commonwealth's conduct in the case before us bears little, if any resemblance, to *Duncan*.

In this case, the Commonwealth provided seven eyewitnesses who identified Kesseh at trial, in addition to more than a dozen video surveillance clips and a litany of stolen items that were on his person when he was arrested.[14] Moreover, and crucially, these comments were isolated, coming in

---

[14] The Commonwealth also presented DNA evidence tying Kesseh to the sexual assault, however, that is not at issue in this appeal.

22

the final minutes of an extensive closing argument in which the Commonwealth had otherwise systematically addressed the elements of each charge against Kesseh. Given the apparent incidental nature of the comments, the fact that the eyewitness number was not integral to the underlying theory and proof of guilt, little suggests that they materially misled the jury. Consequently, Kesseh's argument that the error was flagrant is unmeritorious.

3. The penalty phase testimony:

Kesseh's final substantive allegation of prosecutorial misconduct concerns the testimony of two of the Commonwealth's witnesses, called to testify during the penalty phase of his trial. The first, Sarah Butler,[15] was brought forth to testify regarding Kesseh's prior convictions. As part of her testimony Butler was asked to introduce Kesseh's prior convictions. During that exchange, Butler testified that Kesseh had previously been convicted of fourth-degree assault and harassment for which he received 179 days, conditionally discharged for two years. Afterwards the following exchange occurred:

> Commonwealth: Okay, so when a sentence is conditionally discharged does that mean that he, does he serve a sentence in jail or is that essentially a community supervision type of sentence?

> Butler: Yes, it's community supervision.

Immediately thereafter, a juror requested that he be able to ask the court a clarifying question. The court agreed and had the juror write the question out

---

[15] Butler is a paralegal in the Commonwealth Attorney's Special Victim Unit. Her testimony was limited to discussing Kesseh's prior convictions.

for review. That question asked for clarification about whether Kesseh had served any jail time for those earlier misdemeanor offenses. The court, following a bench conference with both counsels, answered directly that conditional discharge[16] meant that "time was not served. It was the time that was essentially probated on the condition that he do certain things and not do other things." Immediately following this colloquy, and Butler's testimony, the Commonwealth called Tara Vincent[17] to discuss the implications of certain possible penalties which the jury could impose, having found Kesseh guilty. As part of her testimony, Vincent stated that during probation an individual is "allowed to remain in the community instead of going to prison[;]" and that the conditions of the "community supervision" are based on a needs assessment completed by the Department. Kesseh asserts that the proximity between Vincent's discussion of community supervision and Butler's explanation regarding Kesseh's prior sentence created an impermissible inference that Kesseh had been under the Department's supervision when he committed his crime spree. Having reviewed the record carefully, we find this allegation entirely without merit.

---

[16] KRS 533.020(3) allows the court to impose conditional discharge when the defendant has been convicted and the court believes "that the defendant should conduct himself according to conditions determined by the court and that probationary support is inappropriate." KRS 533.030 establishes the parameters by which the trial court establishes the conditions of conditional discharge.

[17] Vincent is a district supervisor with the Division of Probation and Parole within Kentucky's Department of Corrections.

In *Robinson v. Commonwealth,* we reversed a conviction after a probation and parole officer provided incorrect information to the jury regarding a defendant's potential parole eligibility. 181 S.W.3d 30, 38 (Ky. 2005). We reasoned that "[t]he use of incorrect, or false, testimony . . . is a violation of due process when the testimony is material[]" regardless of whether the prosecutor operated in good faith. *Id.* In that case, the parole and probation officer incorrectly testified that a defendant's good time credits would be factored into his parole eligibility when, in reality, "[a]lthough statutory good time is listed in the sentence calculation on a prisoner's resident record card, the prisoner does not actually receive credit for his good time until he reaches the minimum parole eligibility (or, in this case, service of 20% of his sentence)." *Id.* The Commonwealth relied on this incorrect testimony in arguing that the defendant should receive the maximum sentence possible. *Id. See also Beard v. Commonwealth,* 581 S.W.3d 537, 546 (Ky. 2019) (finding palpable error when the Commonwealth urged the jury to recommend the maximum sentence for each crime, to be run consecutively, after misinforming the jury that the defendant would be parole eligible after only serving 20% of the sentence). Simply stated, the crucial distinction between *Robinson* and this case is that here the testimony provided was correct. Butler's and Vincent's description of "conditional discharge" and "community supervision" accurately reflected KRS 533.020. Consequently, we find no error.

***V. No cumulative error.***

Lastly, Kesseh contends that his convictions should be reversed based on cumulative error, "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). Cumulative error has been found "where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Id.* Since none of the errors in this case have been found individually substantial or prejudicial, no cumulative error resulted.

## III. Conclusion

For the foregoing reasons, we affirm the judgment of the Jefferson Circuit Court.

Minton, C.J.; Conley, Hughes, Keller, Lambert and VanMeter, JJ., sitting. All concur. Nickell, J., not sitting.

COUNSEL FOR APPELLANT:

Christopher Barrett Thurman
Louisville Metro Public Defender's Office

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General